VAN D. PETERSON, JR., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Peterson v. Commissioner
Docket No. 8237-80.
United States Tax Court
T.C. Memo 1982-442; 1982 Tax Ct. Memo LEXIS 310; 44 T.C.M. (CCH) 674; T.C.M. (RIA) 82442; August 2, 1982. *310 Held: Because the term of the lease was not limited to the three-year period stated in the lease agreement but was of indefinite duration, it was not less than 50 percent of the useful life of the leased equipment; therefore, sec. 46(e)(3) precluded the lessor from taking any investment credit with respect to such property. William W. Sumner, for the petitioners. Robert W. Towler, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge:* Respondent determined deficiencies against the petitioners for the year 1976 in the following amounts: Petitioner
Amount of Deficiency
Van D. Peterson, Jr.
$1,771
Frederick W. King and
Margaret G. King
1,772
Stanley J. Smiley and
Louise Smiley
1,775
Edward B. Butler, Jr., and
June E. Butler
1,769
ohn M. Johannessen and
Felicia K. Johannessen
1,780
Ivan D. Siddons and
Sharon V. Siddons
1,776
James M. Moorefield and
Helen M. Moorefield
1,776
Arthur A. White and
Katie S. White
1,776
Ellis J. Andras, Jr., and
Barbara T. Andras
1,781
Franklin L. Banker and
Karen W. Banker
1,791
Tommy J. Poirier and
Virginia C. Poirier
1,732
*311 With respect to each petitioner, only $1,440 of the asserted deficiency is in dispute. The sole issue for decision is the application of the dual requirements of section 46(e)(3)(B)[2] to the facts of this case. The parties have stipulated that the 15-percent requirement is met. The issue, therefore, is whether the partnership in which petitioners were partners is precluded from claiming an investment credit with respect to equipment leased to a corporation also controlled by petitioners on the ground that the term of the lease was more than 50 percent of the useful life of the equipment. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The parties have stipulated that Ivan and Sharon Siddons resided in Houston, Texas, and all the other petitioners resided in California when the petition in this case was filed. Messrs. Peterson, King, Smiley, Butler, Johannessen, Siddons, Moorefield, White, Andras, and Banker and Mrs. Poirier were partners in Sacramento Radiology Group, a general partnership (hereinafter the Partnership), during the fiscal year of *312 the Partnership ending September 30, 1976. The other petitioners are the spouses of the partners and are involved in this case only because they filed joint income tax returns with their spouses in 1976. From its formation in 1959 until May 1, 1970, the Partnership engaged in the practice of medicine and acquired personal property to use in such practice. In 1970 the Sacramento Radiology Medical Group, Inc. (hereinafter the Corporation), was incorporated. All the partners in the Partnership purchased stock in the Corporation in proportion to their partnership interests, and there were no shareholders in the Corporation who were not partners in the Partnership. When the Corporation began business on May 1, 1970, the Partnership ceased the practice of medicine; instead, the partners continued their practice of medicine solely as employees of the Corporation. The Partnership leased all its personal property to the Corporation under a lease effective on the day the Corporation began business with a stated term of three years. This lease was superseded by a new lease executed on June 1, 1972, with a stated expiration date of September 30, 1975. On December 29, 1975, another lease *313 of all the Corporation's personal property was executed with a stated expiration date of September 30, 1978. Like its predecessors, it contained no reference to any option to renew. This third lease covered all items of personal property described in an appraisal dated September 26, 1975, together with "all those items of personal property of similar nature purchased by Lessor subsequent to said Appraisement and used by Lessee" less any property removed from use. [3] Under the parties' practices, items acquired after the signing of a lease would be included under the lease simply by listing the items on a schedule attached to the lease agreement. The stipulation recites that the term of this third lease commenced on October 1, 1975, although the document is somewhat unclear on this point. [4] *314 Included among the items of property leased to the Corporation under the December 29, 1975, lease was an IBM typewriter that was acquired in October 1975 at a cost of $724.59. This typewriter had been acquired by the Partnership specifically to replace a worn-out typewriter at one of the Corporation's diagnostic offices. In 1975 or early 1976 the Corporation decided it would be more economical to use an "in-house" computer to perform its billing rather than continue its contract with a computer service bureau. The business manager of the Corporation[5] spent a substantial amount of time in his capacity as a corporate employee investigating different types of computer systems. The Corporation decided that a particular IBM computer was best for its needs. Thereafter, the Partnership purchased that IBEM computer and printer and printer keyboard for the computer (hereinafter peripheral equipment) in July 1976 at a cost of $162,901.26, and added them to the schedule of leased equipment. The $162,901.26 cost for the computer and *315 peripheral equipment included $3,183 paid for installing wiring, air conditioning and movable partitions to accommodate the computer in the Corporation's premises. When placed in service, the typewriter and the computer had useful lives of 84 months, and the peripheral equipment had a useful life of 60 months. By September 30, 1976, the Corporation contracted with IBM for the purchase of between $8,500 and $9,000 worth of computer programs. By early 1977, the Corporation's employees had learned to program the computer themselves and had written some programs. The Corporation subsequently sold some of these programs to other medical practitioners for approximately $11,500. Under the December 29, 1975, lease, the Corporation paid the Partnership rent equal to 2-1/2 percent of the original cost of the typewriter, computer and peripheral equipment for each month the property was used by the Corporation until the stated date of expiration of the lease on September 30, 1978. Subsequent to September 30, 1978, the Corporation continued to use the typewriter, computer *316 and peripheral equipment but rent was reduced to 2 percent of the value of the property as determined by an appraisal on or about September 30, 1978, and the Corporation assumed all responsibility for maintenance of this equipment. We conclude that the Partnership and its partners and the Corporation and its stockholders operated from the initial incorporation under an informal agreement or understanding that whenever the doctor employee-stockholders of the Corporation needed additional or replacement items of personal property to carry out their medical practice, the Partnership would acquire and lease such items. There is no evidence that this practice served any real or presumed business purpose. Through the Partnership's fiscal year ending September 30, 1976, the partners in the Partnership owned stock in the Corporation in the same proportion they held their partnership interests. Since September 30, 1976, it has been the position of the Partnership that no new partners will be admitted even if new shareholders are permitted to acquire stock of the Corporation. It has also been the position of the Partnership since September 30, 1976, that partners will not be required to *317 dispose of their partnership interests if they dispose of their stock in the Corporation. Therefore, after September 30, 1976, it was possible that the membership of the Corporation and the Partnership would no longer remain identical. On October 1, 1976, one of the partners withdrew from the Partnership and also sold all his stock in the Corporation. Since that date, there have been no further withdrawals from the Partnership. On October 1, 1978, three of the partners had their corporate stock redeemed but retained their partnership interests, and on April 1, 1979, another of the partners had his stock in the Corporation redeemed but retained his partnership interest. On October 1, 1976, an individual acquired stock of the Corporation but did not enter into the Partnership. Likewise, on October 1, 1978, October 1, 1979, and April 1, 1980, three individuals acquired stock in the Corporation but did not enter into the Partnership. Thus, in the five years subsequent to September 30, 1976, there was some change in the stockholding of the Corporation, but individuals who were partners in the Partnership on May 1, 1970, still retained control of the Corporation. It has been stipulated *318 that the deductions with respect to the typewriter, computer and peripheral equipment allowable to the Partnership solely by reason of section 162 (other than rents and reimbursed amounts) exceeded 15 percent of the rental income produced by these properties during the first 12 months after they were transferred to the Corporation. This satisfies that requirement of section 46(e)(3)(B). We find as an ultimate fact that the lease dated December 29, 1975, was not limited to its stated three-year term but was of indefinite duration, thus violating the other applicable requirement of section 46(e)(3)(B). OPINION Section 38 allows a credit for investments in "section 38 property," which respondent concedes the typewriter, computer and peripheral equipment in this case are. However, section 46(e)(3) limits the availability of the credit to noncorporate lessors, such as the Partnership. This subsection provides: (3) Noncorporate Lessors.--A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if-- (A) the property subject to the lease has been manufactured or produced by the lessor, or (B) the term *319 of the lease (taking into account options to renew) is lss than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property. Here, we are concerned with whether the Partnership qualified under subparagraph (B) of section 46(e)(3). It has been stipulated that the 15-percent test--the second test set forth in subparagraph (B)--has been satisfied here. Thus, the only question to resolve is whether the term of the lease, taking into account any options to renew, was less than 50 percent of the useful life of the property. Under the December 29, 1975, lease, the stated term was 27 months for the leasing of the computer and peripheral equipment (from July 1976 through September 30, 1978) and 36 months for the leasing of the typewriter (from October 1975 through September 30, 1978), and the lease agreement contained no reference *320 to any option to renew. However, respondent contends that, in substance, the term of the lease was not limited as provided in the lease agreement but was instead of indefinite duration, with the result that the Partnership could not claim the investment credit because the term of the lease was more than 50 percent of the useful life of the property. Petitioner argues, on the other hand, that the term stated in the lease agreement should control because it was not reasonably certain that the lease would continue after September 30, 1978, particularly in view of the fact that as of September 30, 1976, the possibility existed that individuals who were partners might no longer control the Corporation. Under the particular facts of this case, we hold for respondent. Neither party has cited, nor are we aware of, any opinion specifically considering whether a lease with a stated term but no stated option to renew can be considered as being of indefinite duration for purposes of the investment tax credit. However, respondent has relied upon cases such as G.W. Van Keppel Co. v. Commissioner,295 F.2d 767, 770-771 (8th Cir. 1961), affg. a Memorandum Opinion of this Court, and Highland Hills Swimming Club, Inc. v. Wiseman,272 F.2d 176 (10th Cir. 1959), *321 that dealt with the period in which a lessee can depreciate or amortize the cost of improvements made on leased property. These cases are analogous to the situation before us because they were concerned with the precise factual issue with which we are faced here, i.e., whether the stated term of a lease should be disregarded as being not in reality its actual term. In determining whether a lease is in substance of indefinite duration rather than limited to the terms stated in the lease agreement, the courts should consider all the circumstances that throw light on the transaction. Highland Hills Swimming Club, Inc. v. Wiseman,supra at 179; Buddy Schoellkopf Products, Inc. v. Commissioner,65 T.C. 640, 656 (1975). In applying this facts and circumstances approach, the test to be used is whether there is a reasonable certainty that the lessee will continue leasing the property beyond the stated period of the lease. G.W. Van Keppel Co. v. Commissioner,supra; Standard Tube Co. v. Commissioner,6 T.C. 950, 955 (1946). Among the factors supporting respondent's determination that the lease was of indefinite duration are: the established practice of the Partnership to rent all its personal *322 property to the Corporation and to renew all such leases, the purchase of the typewriter, computer and peripheral equipment for the Corporation's specific needs, and the existence of common control of the Partnership and Corporation. However, an even more important fact here is that the decision to retain all of the depreciable property in the Partnership upon incorporation of the medical practice and to have the Partnership continue to supply all depreciable equipment needed by the doctors (the shareholder-partners) appears to have served no business purpose other than the obvious tax advantage. The fact pattern here simply suggests too strongly a tax savings motivation, which obviously implies an intent to renew the lease indefinitely so long as the corporate stockholders are paying rent to themselves. There is no evidence that the Corporation ever even considered leasing any item of personal property from anyone other than the Partnership. We have found that the typewriter was specifically purchased to replace a particular typewriter that had been used by the Corporation but had worn out, and that the computer and peripheral equipment were purchased by the Partnership only after *323 the Corporation decided that it needed computer equipment and selected the particular type of computer that would best fulfill its needs. We note that the Corporation's business manager selected the equipment. Indeed, it appears that the specific needs of the Corporation dictated what items of equipment were to be purchased by the Partnership, except for the few items leased to Mercy Hospital. This tailoring of the Partnership's equipment purchases to the particular needs of the Corporation, its only lessee, other than the hospital, strongly suggests that there was no foreseeable possibility of the lease not being continued beyond its stated expiration date of September 30, 1978. See Buddy Schoellkopf Products, Inc. v. Commissioner,supra at 657; see also Highland Hills Swimming Club, Inc. v. Wiseman,supra.There was a symbiotic relationship between the Partnership and the Corporation since, assuming that the equipment was leased at fair rental value, and we have no reason to assume otherwise, both the Partnership and the Corporation benefited from the continued leasing of the equipment. Such mutual concern for continuing the lease, particularly when coupled with the established *324 practice of renewal, strongly indicates that the lease was of indefinite duration. See Morris v. Commissioner,38 T.C. 279, 284-286 (1962). As of the inception of the December 29, 1975, lease, there was an established practice between the Corporation and the Partnership of renewing the leases of personal property even though the leases themselves contained no renewal options. This established pattern of routinely renewing the leases reinforces the implication that the stated term of the December 29, 1975, lease should be disregarded. See Morris v. Commissioner,supra at 284-286; and Kerr-Cochran, Inc. v. Commissioner,30 T.C. 69, 78-79 (1958), in which we based our findings that leases were not restricted to the stated periods largely upon the pattern of renewing all prior leases. We note that the period specified in the lease agreement, that is, until September 30, 1978, covered a substantial portion of the useful life of each of the items of equipment involved here. For the typewriter, 36 months of its 84-month useful life expired by September 30, 1978; for the computer, 27 months of its 84-month useful life; and for the peripheral equipment, 27 months of its 60-month useful life. *325 This comes to 42 percent, 32 percent, and 45 percent, respectively. Only a relatively short extension of the lease period--15 months--would encompass at least 50 percent of the useful lives of all this equipment. Common control of the lessor and lessee has often been seen as an important factor to be weighed in determining whether the stated term of a lease should be disregarded. See G.W. Van Keppel Co. v. Commissioner,supra at 771-772; Highland Hills Swimming Club, Inc. v. Wiseman,supra at 180; and Buddy Schoellkopf Products, Inc.. Commissioner,supra at 656-657. Prior to October 1, 1976, the partners in the Partnership always owned stock in the Corporation in the same proportion they held their partnership interests. However, after September 30, 1976, persons purchasing stock in the Corporation were no longer permitted to join the Partnership and stockholders disposing of their stock in the Corporation were not required to withdraw from the Partnership. Indeed, on October 1, 1976, an individual was permitted to acquire stock of the Corporation without also acquiring a Partnership interest. Thus, as of October 1, 1976, ownership of the two entities was no longer exactly identical *326 and there was a possibility that over time the partners might no longer have majority control of the Corporation. Petitioners argue that this mere possibility of the Partnership's loss of control over the Corporation, which existed at the end of the taxable year the equipment was placed in service, [6] *327 makes irrelevant the existence of common control in 1976. However, there has been no showing that this change in control would occur over anything but an extended period of time, certainly not within the initial period of the lease or even within the useful life of the equipment. As of September 30, 1976, the possibility of a future change in membership that might affect control was entirely speculative. Events not reasonably foreseeable should not be taken into account in construing the lease. See Ridder v. Commissioner,76 T.C. 867, 874 (1981). Petitioners argue that a factor indicating that the lease was not designed to be of indefinite duration was that when the lease was continued after the expiration of the written agreement on September 30, 1978, the typewriter, computer and peripheral equipment were appraised, and the Corporation's monthly rents were reduced, although the Corporation also assumed maintenance responsibilities with respect to the equipment. However, the fact that the amount of rent was subject to change at a date after the entering into of the initial lease does not have much bearing on whether it was reasonably certain the lease itself would continue in existence for an indefinite duration. See Hens & Kelly, Inc. v. Commissioner,19 T.C. 305 (1952), in which we found that the term of a lease included its renewal period because it was reasonably certain the lease would be renewed, even though at renewal the property was to be reappraised. *328 [7]
In most of the cases in which the courts found leases to be of indefinite duration, a major factor indicating that the stated term of the lease should be disregarded was that the lessee had expended considerable sums in making improvements that would benefit only the lessor if the lease were terminated. This factor is not present here. Although the Corporation expended some funds to obtain programs to use on the particular computer leased to it by the Partnership, the amount of money so expended was not very significant, especially in view of the fact that the Corporation sold its programs to other medical practitioners for between $2,500 and $3,000 more than the price it paid for the programs purchased from IBM. Of the total $162,901.26 purchase price of the computer and peripheral equipment, only $3,183 was for improvements to the premises in which the Corporation used the computer. Thus, neither the Partnership nor the Corporation had significant invested capital that it might lose if the leases were terminated. The small amount of invested capital which would be lost *329 on lease termination favors petitioners' argument that the lease was not of indefinite duration. However, when looking at the facts and circumstances overall, the conclusion is inescapable that the lease was to be continued for a period that would encompass at least 50 percent of the useful life of each item of equipment. We emphasize that this conclusion is based on the particular facts of this case, in which the lessor and lessee have been wedded together by an established practice whereby items of equipment needed by the Corporation have always been purchased by the Partnership and leased to the Corporation. Not only have the lessor and lessee been under common control since the inception of the Corporation[8] but the Partnership's engagement in the equipment leasing business has been for the sole purpose of providing equipment to the Corporation, with the one exception concerning the few items of equipment leased to the hospital. This exception seems to fit the same pattern. In this particular case, it is obvious that when the equipment involved here was placed in service the Partnership's practice of leasing to the Corporation all the equipment it needed was firmly established *330 and was reasonably certain to continue long into the future. Therefore, we have found as a fact that both the lessor and lessee anticipated that the lease would be for an indefinite duration, or at least for the period encompassing the useful life of the equipment. [9] *331 Accordingly, we hold that under section 46(e)(3) the Partnership was not entitled to any investment credit with respect to the typewriter, computer and peripheral equipment. Decision will be entered for the respondent.
Footnotes
1. The following petitioners are also included in this case: Frederick W. King and Margaret G. King; Stanley J. Smiley and Louise Smiley; Edward B. Butler, Jr., and June E. Butler; John M. Johannessen and Felicia K. Johannessen; Ivan D. Siddons and Sharon V. Siddons; James M. Moorefield and Helen M. Moorefield; Arthur A. White and Katie S. White; Ellis J. Andras, Jr., and Barbara T. Andras; Franklin L. Banker and Karen W. Banker; and Tommy J. Poirier and Virginia C. Poirier.↩
*. This case was tried before Judge Cynthia H. Hall, who has resigned from the Court. By order of the Chief Judge, the case was reassigned to Judge Meade Whitaker↩ for disposition.
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
3. This lease included all equipment owned by the Partnership on the date of the appraisal. ↩
4. During the terms of the three leases, the only personal property owned by the Partnership and not leased to the Corporation was a sonograph and related equipment leased to Mercy Hospital on a year-to-year basis. While the record is silent on the reason for the purchase and rental of this equipment, it is a reasonable inference that the equipment was acquired for use by the doctor-stockholders in the Corporation who were also staff members at Mercy Hospital.
5. This individual was also an unsalaried business manager for the Partnership. The Partnership had no compensated employees.↩
6. Our decisions under section 46(e)(3)(B) indicate that in determining whether the term of a lease equals or exceeds 50 percent of the property's useful life, the facts and circumstances in existence at the end of the taxable year in which the property is placed in service must be examined. Ridder v. Commissioner,76 T.C. 867, 872-873 (1981); Bloomberg v. Commissioner,74 T.C. 1368, 1372 (1980). Similarly, our decisions concerning the period for amortizing the cost of leasehold improvements have focused on the facts in existence at the end of the taxable year. See, e.g., Morris v. Commissioner,38 T.C. 279↩ (1962).
7. See also G.W. Van Keppel Co. v. Commissioner,T.C. Memo. 1960-224, affd. 295 F.2d 767↩ (8th Cir. 1961).
8. Although common control of the lessor and lessee is certainly an important factor and may often indicate a community of interest between the lessor and the lessee and the intent to continue leases indefinitely, we do not mean to intimate that common control is in itself the decisive factor. All the facts and circumstances of each case must be analyzed in determining whether a lease is designed to extend beyond its stated term, and the existence of common control is but one of these factors. Compare sec. 178(b), added by the Technical Amendments Act of 1958, sec. 15(a), 72 Stat. 1612, which makes the existence of common control determinative for purposes of amortizing or depreciating a building erected by a lessee on leased property. ↩
9. We further note that the Corporation had a substantial indirect investment in the computer in that the business manager and two other employees received special training and became reasonably expert in programing and using the equipment. While the Corporation itself could have acquired by lease or purchase similar equipment, it had no reason to do so. Neither party had any incentive to fail to renew the lease arrangement which was economically beneficial to each.